**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Case No. ________________

OneShield, Inc.,

Plaintiff,

vs.

MMIC Group, Inc.,

Defendant.

**COMPLAINT**
(Jury Trial Demanded)

Plaintiff OneShield, Inc. ("OneShield") for its Complaint against Defendant MMIC Group, Inc. ("MMIC") alleges as follows:

## INTRODUCTION

1. This is a breach of contract action arising from the failure of Defendant MMIC to pay monies to Plaintiff OneShield for software licensed to it under a Software License Agreement, and for services provided pursuant to an Implementation Services Agreement. MMIC has sought to unilaterally terminate those agreements without any breach on the part of OneShield, but has refused to pay more than $700,000 owed thereunder.

## PARTIES

2. Plaintiff OneShield is a Delaware corporation in the business of providing enterprise-wide policy management, billing, rating, claims administration, product configuration, business intelligence and analytic software solutions, and related services, to the insurance industry. It has a principal place of business at 62 Forest Street,

Marlborough, Massachusetts, but also maintains an office in India. The company was founded in 1999, and has approximately 175 employees.

3. Upon information and belief, Defendant MMIC is a Minnesota corporation with its principal place of business at 7701 France Avenue South, Minneapolis, Minnesota. MMIC primarily offers medical professional liability ("MPL") insurance to physicians and other health care providers. It touts itself as "the Midwest's largest medical professional liability company," and, upon information and belief, MMIC has more than 150 employees and $1 billion in assets.

**JURISDICTION AND VENUE**

4. The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the claims are between citizens of different states.

5. Venue is proper under 28 U.S.C. § 1391(a) because a substantial portion of the events giving rise to this dispute occurred within this district, and because MMIC is subject to the Court's personal jurisdiction.

6. Jurisdiction and venue are also proper pursuant to the terms of the Software License Agreement and Implementation Services Agreement between the parties to this action, which expressly provide that OneShield and MMIC "consent to the jurisdiction of the State and Federal Courts located in Minnesota" and that "[a]ll litigation arising out of or related to [the Agreements] must be brought in Courts located in the State of Minnesota."

## FACTS

### A. The OneShield Solution

7. OneShield's core product is called "Dragon." Dragon is a software-based transaction processing engine and associated computer software components (collectively, the "Software") that is at the heart of a system used by insurers to manage insurance policies and related transactions and data. OneShield licenses the Software to its customers. While OneShield periodically updates the Software to improve it or make new functionality generally available, OneShield does not typically customize the Software on a client-by-client basis.

8. The solution that OneShield offers is highly configurable, however. This is possible because the Software operates through the use of configuration files or "metadata tables" ("Metadata"), which direct the operation of the Software in ways specific to each customer's own situation. In the same way that Microsoft Excel requires a spreadsheet file populated with data, formulas, and functions to perform calculations and display data, the Software relies on the Metadata to dictate how various insurance-related transactions are performed, tracked, and reported. Each customer that licenses the Software will require that Metadata be populated and configured to meet its unique needs. Some customers pay OneShield to perform this configuration work. Other customers hire third parties to do it. And still others configure the Metadata in-house.

9. OneShield has developed pre-configured Metadata to perform certain generic functions (often specific to particular types of insurance policies) to allow

prospective customers to view the capabilities of the Software and to serve as a starting point for actual customer Metadata configuration efforts.

**B. MMIC's RFP**

10. On August 5, 2013, MMIC issued a Request for Proposal ("RFP") for a software-based system for handling various rating, underwriting, and finance functions, as described in specifications set forth in the RFP. OneShield responded to the RFP ("RFP Response"), proposing a system based on its Dragon-based Software. A true and accurate copy of the RFP, with OneShield's RFP Response, is attached at Exhibit A.

11. The RFP Response described "OneShield's Dragon solution" (the "Solution") – incorporating both the Software and Metadata – in detail. The RFP Response anticipated MMIC not only licensing the Software from OneShield, but also engaging OneShield to perform the extensive implementation work necessary to configure the Metadata to suit MMIC's specifications. The implementation portion of the project, necessary to configure the solution for MMIC, was estimated in the RFP Response to cost $5,150,340 and take 309 days to complete.

12. MMIC expressed interest in OneShield's Solution, and engaged in an extensive due diligence process lasting more than four months to consider and evaluate it, OneShield, and the experience of other OneShield customers. In connection with that process, OneShield responded to numerous inquiries from MMIC, and made itself available for many discussions regarding the contemplated implementation process. OneShield provided two separate in-person demonstrations of the system for MMIC personnel, and followed up with additional remote demonstrations. It also made existing

OneShield customers, including customers who issued MPL policies, available to MMIC to discuss the product.

13. In February 2014, following the due diligence process, OneShield provided a preliminary resource-based estimate (the "Pre-Sales Configuration Estimate") for services related to configuring the Solution for MMIC. A true and accurate copy of the "Pre-Sale Configuration Estimate" is attached as Exhibit B. This Pre-Sale Configuration Estimate revised some estimates in the RFP Response, and forecast $4,505,000 in charges and a forty-nine week schedule for the services aspect of the project.

**C. The License and Services Agreements**

14. That same month, MMIC informed OneShield that it had been selected for the project, pending execution of definitive agreements by the parties. The contemplated agreements were: (1) a Software License Agreement ("License Agreement"), pursuant to which OneShield would grant MMIC a license to the Software and related documentation; and (2) an Implementation Services Agreement ("Services Agreement"), pursuant to which MMIC would engage OneShield to perform services related to configuring the Metadata to meet MMIC's specific needs.

15. The parties engaged in extended negotiation of these Agreements, and final drafts were agreed upon in April 2014. On April 4, 2014, OneShield and MMIC each executed both the License Agreement and the Services Agreement. A true and accurate copy of the License Agreement is attached as Exhibit C. A true and accurate copy of the Services Agreement is attached as Exhibit D. Both Agreements were valid and became binding on the parties at the time of their execution.

16. In the course of negotiating the License Agreement and the Services Agreement, the parties concluded that the two agreements should remain separate and independent. Consequently, a breach of one Agreement would not constitute a breach, or cause for termination, with respect to the other. OneShield insisted on that approach because the two Agreements addressed very different subject matters.

17. Both the License Agreement and the Services Agreement contain the following "Attorney's Fees" provision:

> In the event of any dispute between the parties arising out of this Agreement, the prevailing party shall be entitled, in addition to any other rights and remedies it may have, to recover its reasonable attorneys' fees and costs, including the costs of litigation, investigation of the claims, and any resulting appeals.

License Agreement § 4(i); Services Agreement § 15(g).

18. Section 1(a) of the License Agreement granted MMIC a perpetual license to the Software and related documentation, in exchange for which MMIC agreed to pay OneShield a license fee of $1.1 million. Pursuant to Section 1(c), a payment of $660,000 became due within 30 days of the License Agreement's execution, and the remaining $440,000 was to be paid by the end of 2014.

19. MMIC made the first payment on April 21, 2014. OneShield invoiced MMIC for the second payment on November 19, 2014. To date, MMIC has failed to make this second payment.

20. Under the License Agreement, MMIC had the option of taking delivery of the Software itself, or having the Software remain on OneShield premises (so as to facilitate the performance of implementation services by OneShield personnel) during the

configuration process. MMIC elected the latter option, and declined to take delivery of the Software on its premises during this process.

21. Under the Services Agreement, MMIC engaged OneShield to perform services related to configuring the Solution to meet MMIC's specific needs. In consideration for such services, MMIC agreed to pay OneShield on a time-and-materials basis, at a stated hourly rate.

22. From when the parties executed the License and Services Agreements (on April 4, 2014) through September 2014, OneShield performed work under the Services Agreement and a separately executed "Statement of Work No. 1" ("SOW1"). SOW1 was incorporated into the Services Agreement, and designed to address various early stage tasks and requirements related to preparing the Solution to meet MMIC's specific needs. OneShield issued regular invoices for its work pursuant to SOW1, and MMIC paid those invoices without complaint.

**D. <u>MMIC's Pilot and Statement of Work No. 2</u>**

23. In late September, MMIC elected to develop a pilot ("Pilot") for the OneShield Solution, and insisted on changing the project methodology. Under the new approach, known in the industry as an "Agile" methodology, MMIC would prioritize outstanding tasks and OneShield would allocate resources based on those priorities. MMIC would use a "Backlog Report" to notify OneShield which functions were to take priority. OneShield was directed to segment the work into four timed phases or "sprints" ending in December, consistent with the priorities set out in the Backlog Report.

24. On October 6, 2014, OneShield and MMIC entered into Statement of Work No. 2 ("SOW2"), which memorialized the terms of the Pilot and was incorporated into the Services Agreement. SOW2 described a broad scope beyond which a new statement of work or change order would be required; the Backlog Report identified those areas within its scope on which OneShield was to focus its attention and resources.

25. The Pilot was never intended to result in a finished, production-ready version of the Solution. Instead, MMIC saw it as a way to get comfortable with OneShield's Software and the implementation process. Accordingly, OneShield expected that the Pilot would necessarily focus on those aspects of the project that MMIC prioritized most highly, and not the entire project as a whole.

26. However, as work on the Pilot proceeded, OneShield became concerned about a number of failures and shortcoming by MMIC. For instance, MMIC twice changed the look and feel of the user interface, which was unnecessarily disruptive in the context of developing the Pilot and led to avoidable delays. MMIC also failed to provide sufficient detail for OneShield to provide accurate policy rating results, thus preventing OneShield from properly implementing the Software. Perhaps most disturbing, while SOW2 required MMIC to provide "*detailed acceptance and success criteria, including test cases, to assure OneShield has all the information needed to be successful,*" MMIC never gave OneShield consistent direction on how Pilot success was to be measured through the time of its delivery on December 22, 2014.

27. On December 22, 2014, OneShield provided a demonstration of the last Pilot phase, or "sprint," to MMIC. According to the Backlog Report as it existed at the

time, OneShield had satisfied at least 58 of the 59 items MMIC had designated as high priority for the Pilot. During, and in discussions immediately following, the demonstration, MMIC provided no indication to OneShield that OneShield had breached any obligations under the Agreements. Indeed, immediately following the demonstration, MMIC instructed OneShield to prepare for the next phase of work, to be delivered in January 2015.

28. At all times, OneShield performed fully under both the License Agreement and Services Agreement.

**E. <u>MMIC's Notice of Termination of Agreements</u>**

29. On December 29, 2014, MMIC Chief Financial Officer Steve Lacke sent a letter (the "Termination Letter") to OneShield President and Chief Executive Officer Glenn Anschutz, giving notice of MMIC's intent to terminate the Services Agreement effective January 28, 2015, and purporting to terminate the License Agreement effective December 30, 2014. A true and accurate copy of the Termination Letter is attached as Exhibit E.

30. OneShield was shocked to receive the Termination Letter. The project was still in the early stages of configuration and implementation, and it was still on budget. In fact, OneShield was confident enough in its estimate that it had offered to enter into a fixed price arrangement to complete the project consistent with the $4.5 million Pre-Sales Configuration Estimate, but MMIC never accepted (or even responded to) that offer.

31. In the Termination Letter, MMIC cited Section 13(b) of the Services Agreement, which permitted MMIC to terminate the agreement for convenience on 30 days' notice.

32. The Termination Letter did not reference any termination provision of the License Agreement. The License Agreement provides MMIC with a perpetual license for the Software, and does not provide for termination by MMIC except in the event of a bankruptcy proceeding involving OneShield. OneShield is not now, and has never been, the subject of a bankruptcy proceeding.

33. Mr. Anschutz responded to the Termination Letter with a response to Mr. Lacke on January 8, 2015. A true and accurate copy of this response is attached hereto as Exhibit F.

34. In the Termination Letter, MMIC complained that "OneShield failed to deliver [the] [S]oftware." OneShield responded that, pursuant to the terms of the License Agreement, "Delivery of the Software is completely at the customer's discretion. MMIC has yet to notify OneShield that it has setup an environment to receive the Software. OneShield stands ready to deliver the Software at MMIC's chosen location and time." To date, MMIC has not directed OneShield to deliver the Software.

35. In the Termination Letter, MMIC also claimed that the Software does not conform to the Software description attached to the License Agreement as Exhibit A. But the Software is fully compliant with this description, and MMIC has failed to specifically identify how the Software does not conform.

36. MMIC additionally alleged in the Termination Letter that it was prompted to terminate the Services Agreement because OneShield breached its warranty to provide services in a "professional and workmanlike manner consistent with the highest industry standards," pointing specifically to work performed under SOW2. However, all of the services performed and invoiced by OneShield were provided in a professional and workmanlike manner, were within the scope of SOW2, and were focused on those items prioritized by MMIC though the Backlog Report.

37. OneShield issued the following invoices to MMIC for the services performed under SOW2:

| Invoice No. | Invoice Date | Amount | Services Period | Date Paid |
|---|---|---|---|---|
| 101264 | 11/12/14 | $167,096.25 | 9/28/14 to 10/25/14 | 11/19/14 |
| 101311 | 12/8/14 | $197,374.75 | 10/26/14 to 11/22/14 | 12/17/14 |
| 101337 | 12/30/14 | $174,451.25 | 11/23/14 to 12/13/14 | Not Paid |
| 101366 | 1/14/15 | $107,336.25 | 12/14/14 to 12/29/14 | Not Paid |

As noted, MMIC has failed to pay $281,787.50 under the Services Agreement, representing work performed and invoiced by OneShield under SOW2.

38. Each SOW2 invoice includes a detailed breakdown of the services performed by each OneShield employee on a daily basis. Prior to OneShield receiving the Termination Letter, MMIC: (i) never disputed any of the SOW2 Invoices by claiming that the services were outside the scope of SOW2; (ii) never alleged that OneShield failed to provide the services requested under the Backlog Report; and (iii) never claimed that OneShield was not meeting its obligations of professionalism and workmanship with

respect to any work done under SOW2. Indeed, prior to the date of the Termination Letter, MMIC never objected to a single item in any SOW2 Invoices, or any other OneShield invoice, on any basis whatsoever.

39. All of the services performed by OneShield, including those billed under unpaid SOW2 invoices, were within the scope of SOW2, were necessary, appropriate and consistent with the Backlog Report, and were in compliance with OneShield's warranties under the Services Agreement.

**COUNT I**
**Breach of Contract (License Agreement)**

40. OneShield incorporates and realleges the allegations in each of the preceding paragraphs as if fully set forth within this paragraph.

41. The License Agreement is a valid, enforceable contract between OneShield and MMIC.

42. OneShield has fully performed its obligations under the License Agreement.

43. In failing to perform as agreed, including by failing to make the second required payment for the Software license, MMIC breached the License Agreement.

44. As a result of MMIC's breach, OneShield has suffered monetary injury, including but not limited to damages, interest, costs, and attorneys' fees, in amounts to be determined at trial.

**COUNT II**
**Breach of Contract (Services Agreement)**

45. OneShield incorporates and realleges the allegations in each of the preceding paragraphs as if fully set forth within this paragraph.

46. The Services Agreement is a valid, enforceable contract between OneShield and MMIC.

47. OneShield has fully performed its obligations under the Services Agreement.

48. In failing to perform as agreed, including by failing to pay outstanding invoices under SOW2, MMIC breached the Services Agreement.

49. As a result of MMIC's breaches, OneShield has suffered monetary injury, including but not limited to damages, interest, costs, and attorneys' fees in amounts to be determined at trial.

**COUNT III**
**Breach of Covenant of Good Faith and Fair Dealing**

50. OneShield incorporates and realleges the allegations in each of the preceding paragraphs as if fully set forth within this paragraph.

51. The License Agreement and the Services Agreement between OneShield and MMIC are valid and binding contracts. Implied in each of those Agreements is a covenant that MMIC would act in good faith and deal fairly with OneShield.

52. OneShield complied with its obligations in accordance with both the License Agreement and Services Agreement, and performed the Agreements in good faith.

53. MMIC breached the covenant of good faith and fair dealing implied in those Agreements by insisting on counterproductive changes to the implementation methodology and Pilot user interface, and by refusing to provide detailed acceptance and success criteria against which to measure the Pilot, thereby imposing substantial and unnecessary barriers to successful completion of the project. These barriers frustrated OneShield's ability to perform under the Agreements.

54. As a result of MMIC's breach of the covenant of good faith and fair dealing implied in the Agreements, OneShield has suffered damages in an amount to be determined at trial.

**COUNT IV**
**Quantum Meruit**

55. OneShield incorporates and realleges the allegations in each of the preceding paragraphs as if fully set forth within this paragraph.

56. OneShield rendered valuable services to MMIC, and made available to MMIC valuable Software.

57. MMIC accepted the services and Software provided by OneShield.

58. MMIC was aware that OneShield expected to receive payment for the services and Software provided to MMIC.

59. MMIC failed to fully pay for the services and Software provided by OneShield, but nevertheless benefited from these services and Software.

60. As a result of MMIC's failure to pay, OneShield has suffered damages in an amount to be determined at trial.

## JURY DEMAND

OneShield demands a trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, OneShield respectfully requests judgment against MMIC as follows:

1. An award of damages in an amount to be determined at trial.

2. An award of statutory interest, costs, and reasonable attorney's fees pursuant to the License Agreement and Services Agreement between the parties.

3. Any other relief that the Court deems just and equitable.

Dated: June 17, 2015

Respectfully submitted,

/s/ Faris A. Rashid

Martin S. Chester (#31514X)
Martin.Chester@FaegreBD.com
Faris Rashid (#391508)
Faris.Rashid@FaegreBD.com
**FAEGRE BAKER DANIELS LLP**
200 Wells Fargo Center
Minneapolis, MN 55403
Telephone: 612-766-7000
Facsimile: 612-766-1600

Of Counsel:

Joseph J. Laferrera (pro hac vice pending)
Joe.Laferrera@gesmer.com
Nicole Forbes (pro hac vice pending)
Nicole.Forbes@gesmer.com
**GESMER UPDEGROVE LLP**
40 Broad Street
Boston, Massachusetts 02109
Telephone: (617) 350-6800
Facsimile: (617) 350-6878